# EXHIBIT A

  1         purpose of the meeting was?
  2    A.   **I mean, like they started it off, of course.  I don't**
  3         **know the exact wording of it.**
  4    Q.   Okay.  But I mean, general sense you remember them
  5         saying the purpose of that is we want to talk about your
  6         performance or what?
  7    A.   **It wasn't -- to what I recall, it was just them, for**
  8         **over two hours, saying I wasn't a good K9 handler.**
  9    Q.   And Ms. Guerber is an employee of Beaumont and Mack and
 10         Wilkes are K9 Academy employees, right?
 11    A.   **Yes.**
 12    Q.   Not employees.  Trainers?
 13    A.   **Can you repeat them again?**
 14    Q.   Mack and Wilkes?
 15    A.   **Yes.**
 16    Q.   Are the trainers?
 17    A.   **Yes.**
 18    Q.   Isn't it true that you were repeatedly told that no
 19         decision had been made to terminate your employment?
 20    A.   **I don't recall it.**
 21    Q.   Okay.  It wasn't K9 Academy that decided to terminate
 22         your employment, was it?
 23    A.   **I honestly don't recall.**
 24    Q.   You admitted in your Complaint that nobody at K9 Academy
 25         knew that you had a general anxiety disorder or panic



1      disorder before this meeting on August 16, 2022; is that

2      correct, isn't it?

3  A.  **On an official statement, I never officially told them,**

4      **but they continuously referred to my anxiety.  So yes,**

5      **that is true.**

6  Q.  Well, they referred to you, your stress, right?

7  A.  **And my anxiety.**

8  Q.  They said anxiety?

9  A.  **Verbal, yes.**

10 Q.  Okay.  Do you know whether Mr. Mack or Mr. Wilkes are

11     qualified to diagnose people with anxiety?

12 A.  **I have no idea if they are or not.**

13 Q.  Well, do you know how they knew that you had anxiety?

14 A.  **No.  But going off of what I know is that I have to be**

15     **diagnosed by a doctor or a psychiatrist, not by people**

16     **who work at the school.**

17 Q.  Sure.  Their observations there were that you were

18     stressed, correct?

19 A.  **And that I was anxious.**

20 Q.  Okay.  But did anybody ever say words to the effect that

21     you have an anxiety disorder or a panic disorder?

22 A.  **They said that I have anxiety.  They never used the word**

23     **disorder.  They said anxiety.**

24 Q.  It's important, so I want to make sure I'm clear.  They

25     said you have anxiety?



Tyler Maul
02/05/2024                                        Page 104

1   anxiety.  So there is a difference between the two.  I
2   definitely see it as two different.
3  Q. You can be stressed by uncertainty, right?
4  A. I mean, I would say anxious by uncertainty.  That kind
5   of fits in with it better.
6  Q. All right.  You never told any K9 personnel, including
7   Mack or Wilkes, that you had private health issues?
8  A. Correct, I did not.
9  Q. As far as you know, they didn't have that information
10   regarding your general anxiety disorder or your panic
11   disorder?
12 A. Correct.
13 Q. Okay.  From what it sounds like, your discussion of
14   Mr. Berger, Mr. Macbay and Mr. Teatsworth, they weren't
15   the only folks that made observations that you appeared
16   anxious?
17 A. Correct.
18 Q. Now did anybody from K9 Academy -- first of all, back
19   up.
20       Did you ever ask K9 Academy for any type of
21   accommodation?
22 A. Not that I can recall.
23 Q. Okay.  Did you ever ask Beaumont for any kind of
24   accommodation?
25 A. When it started to heighten up before I had to go on



 1  Q.  So when you needed the leave, you could take it?
 2  A.  **Correct.**
 3  Q.  Okay.
 4  A.  **I honestly thought when it was approved things were**
 5      **going to get better.  I didn't think they were going to**
 6      **get worse.**
 7  Q.  Is it fair to say at the August 16 meeting that Mr. Mack
 8      expressed to you his belief that you didn't have the
 9      skills to be a K9 handler?
10  A.  **That was one of the things that was said in that**
11      **meeting.**
12  Q.  Okay.  Do you think he was telling you that because you
13      had a disability?
14  A.  **I mean, I could see so because like a lot of the times**
15      **they reference the word anxiety.  Referencing the dog,**
16      **how it goes down the leash, things like that.  Or they**
17      **are saying the dog is becoming anxious because I'm**
18      **anxious, things like that.**
19  Q.  Okay.  But we agree that at this August 16 meeting,
20      nobody from K9 knew that you had an anxiety disorder or
21      a panic disorder, correct?
22  A.  **To my knowledge, yes.**
23  Q.  Okay.  Would you agree, with me, if you didn't have
24      either of those and you just got really worked up about
25      being a K9 handler, that that could be a reason to



```
                         Tyler Maul
                         02/05/2024                    Page 163
```

1  Q.  So to sum up this little exercise, you have been able to
2      identify your own voice on this recording, right?
3  A.  Yes.
4  Q.  And the voices of Whitney Guerber, Dan Mack and Mark
5      Wilkes?
6  A.  Yes.
7  Q.  In your meeting with these folks, did you tell them
8      anything that was untrue?
9  A.  Not that I know of.
10 Q.  Okay.
11 A.  I always try to tell the truth no matter where I go.
12 Q.  It's a good practice.  All right.
13         Again, look at your Exhibit 1 which is the
14     Complaint, page 28, paragraph 155.  I will read 155, so
15     we know what it is.  "As detailed in the above
16     allegations, Tucker, Guerber, Mack and Wilkes illegally,
17     maliciously and wrongfully conspired with one another
18     with the intent to and for illegal purposes of,
19     including but not limited to, revoking Plaintiff's K9
20     handler certification and terminating him from his
21     employment as a K9 handler."
22         My question to you regarding that allegation
23     is how do you know that Tucker, Guerber, Mack and Wilkes
24     conspired with one another?
25 A.  Because when I brought up the concern about what was



```
 1       happening to Lincoln, all of a sudden I get pulled into
 2       this office.  It's way too close of a timeline for all
 3       of this to happen.  And again, I have never signed
 4       anything and there is nothing in my employee file.
 5  Q.   Okay.  And you don't recall the timing though of how
 6       long between your Complaint and you getting called in on
 7       August 16, 2022?
 8  A.   If I had to, like I said to you before, maybe three,
 9       four-ish weeks.  Again, I don't know.
10  Q.   Okay.  Anything else besides the timing?
11  A.   Nothing I can think of.
12  Q.   Okay.  Have you come up with an economic damage figure
13       ie. how much you have lost in wages and compensation as
14       a result of the alleged conduct of my clients?
15  A.   Offhand, no.  But what I do have is I can explain
16       certain things like my medical bills.  I have to seek
17       medical treatment now.
18  Q.   Okay.
19  A.   Because of my anxiety, it's like tenfold now.  Like I
20       get scared just even doing the most simple things.  I
21       don't have the confidence in what I do.
22  Q.   But I'm talking about wages and benefits.  You're
23       talking about your non-economic damages.  You were
24       talking about medical expenses.  But do you have a
25       figure?
```



1  A.  Not offhand, no.

2  Q.  Okay.  Same exhibit starting at paragraph 28.  It's

3      titled Count 11, intentional infliction of emotional

4      distress as to all defendants.

5            MS. GORMAN:  What page are you on, Jim?

6            MR. FETT:  29.  Count 11.

7  BY MR. FETT:

8  Q.  If you look at page 29 at the top, it's got paragraph

9      158.  It says, "Defendants' conduct was extremely

10     outrageous and of such character as not to be tolerated

11     by a civilized society."  Now you didn't write that

12     language, did you?

13 A.  No.

14 Q.  That's legalese, correct?

15 A.  Correct.

16 Q.  But you agree with that?

17 A.  Yes.

18 Q.  Okay.  And what you can summarize, because you have

19     given us a lot of testimony today, but if you need to be

20     more specific, that's fine.  I'm just telling you it's

21     okay if you want to generalize.  Tell us the conduct

22     that was extreme, outrageous and of a character as not

23     to be tolerated.

24 A.  Well, I can refer back to when I asked and asked and

25     asked for a peaceful resolution again and again knowing



```
 1    how -- because what the recording there doesn't tell you
 2    is that I was through -- my anxiety was through the roof
 3    of what was going on.  I asked Whitney, let's -- please,
 4    let's sit down.  Let's talk.  Let's figure this out.
 5    Let's come up with a solution.
 6              I don't care what happens.  I just want to get
 7    back to doing what I want to do, going back to what I
 8    love to do.  Like it just seemed like every time I was
 9    trying to be that pacifist in the situation, more things
10    were happening.  They took my dog away.  I had to go on
11    intermittent leave, then I was suddenly on an
12    investigation where I didn't even know I was on an
13    investigation until my anxiety peaked to new heights.
14    It just was thing after thing after thing.
15              I feel that was it was extreme.  It was
16    outrageous.  And I feel like a credible and respectable
17    employer would say this is not a way that an employer
18    should treat somebody.  I was willing, this entire time
19    way before this happened, to sit down and talk so we can
20    figure out what we can do, but nobody was having it.
21    Nobody at K9-ATF, nobody at Beaumont.
22 Q. Okay.
23 A. I have it in writing saying I would just want a peaceful
24    resolution.  That's all I wanted.
25 Q. All right.  Anything else you want to add?
```



1  A.  No.

2  Q.  You have got a number of defendants.  We are looking at

3      Beaumont Hospital, K9 Academy, the LLC, Joseph Tucker,

4      Whitney Guerber, Daniel Mack and Mark Wilkes.  Those are

5      the folks that you have sued that are defendants,

6      correct?

7  A.  **Correct.**

8  Q.  All right.  Is there any one of those, whether an

9      individual or a corporate entity, that you think is most

10     responsible for what occurred as set forth in your

11     lawsuit?

12 A.  **Like if one is more responsible than the other, yes.**

13 Q.  I call them bad actors.  Who is the biggest bad actor

14     here?

15 A.  **K9-ATF because I had no issues over at Beaumont, as I**

16     **said a few times already.  I had no issues in my**

17     **employment.  I get to K9-ATF, I do my school.  If I was**

18     **a bad handler I wouldn't have gotten my certification.**

19     **If I was a bad handler and they passed me anyway, then**

20     **that just shows negligence on their part.**

21          **But I passed through anyway.  And nobody said**

22     **anything to Beaumont to where I can say hey, you know**

23     **what, maybe we can go about this.  When I started**

24     **noticing things, I bring it up to Beaumont's attention**

25     **thinking they are going to help me.  But instead chose**

