EXHIBIT 5

Page 1

1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4    TYLER MAUL,

5                   Plaintiff,

6       vs.                    Case No. 23-CV-11139

7                              Hon. Mark A. Goldsmith

8                              Mag. Judge Anthony P. Patti

9    BEAUMONT HOSPITAL - DEARBORN, a

10   Michigan corporation, K-9 ACADEMY

11   TRAINING FACILITY, LLC, a Michigan

12   Limited Liability Company, JOSEPH

13   TUCKER, an individual, WHITNEY GUERBER,

14   an individual, DANIEL MACK, an

15   individual, and MARK WILKES, an individual,

16                   Defendants.

17   _____

18        The Deposition of TERRENCE M. FOLEY

19        Taken at 407 North Main Street, Suite 200

20        Ann Arbor, Michigan

21        Commencing at 9:57 a.m.

22        Thursday, March 7, 2024

23        Stenographically reported by:

24        Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

25   Job No. 6484830

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 2

1 APPEARANCES:
2
3 TERESA J. GORMAN
4 Teresa J. Gorman, PLL
5 5700 Crooks Road
6 Suite 200
7 Troy, Michigan 48098
8 248.763.6943
9 terigorman@aol.com
10    Appearing on behalf of the Plaintiff.
11
12 JAMES K. FETT
13 Fett & Fields PC
14 407 North Main Street
15 Suite 200
16 Ann Arbor, Michigan 48104
17 734.954.0100
18 jim@fettlaw.com
19    Appearing on behalf of the Defendants.
20
21 ALSO PRESENT:
22 Mark Wilkes
23
24
25

Page 3

1            TABLE OF CONTENTS
2
3 WITNESS                    PAGE
4 TERRENCE M. FOLEY
5
6 EXAMINATION BY MS. GORMAN:       4
7 EXAMINATION BY MR. FETT:        76
8 RE-EXAMINATION BY MS. GORMAN:      83
9 RE-EXAMINATION BY MR. FETT:      83
10
11            EXHIBITS
12
13 EXHIBIT                   PAGE
14 (Exhibits attached to transcript.)
15 DEPOSITION EXHIBIT 1           56
16 Defendant K-9 Academy Training Facility, LLC's
17 Responses to Plaintiff's First Interrogatories
18 DEPOSITION EXHIBIT 2           73
19 Subpoena
20 DEPOSITION EXHIBIT 3           76
21 Resume
22 DEPOSITION EXHIBIT 4           77
23 Excerpt from Tyler Maul's Deposition, Pages 14-17
24 DEPOSITION EXHIBIT 5           78
25 Excerpt from Tyler Maul's Deposition, Pages 54-57

Page 4

1 Ann Arbor, Michigan
2 Thursday, March 7, 2024
3 9:57 a.m.
4
5            TERRENCE M. FOLEY,
6 was thereupon called as a witness herein, and after
7 having first been duly sworn to testify to the truth,
8 the whole truth and nothing but the truth by the
9 stenographer, was examined and testified as follows:
10            EXAMINATION
11 BY MS. GORMAN:
12 Q. Would you please state your full name for the record.
13 A. Terrance Michael Foley.
14 Q. Mr. Foley, my name is Teri Gorman. We met briefly. I am
15    one of the attorneys who represents Tyler Maul in
16    litigation against a variety of people, K-9 Training
17    Academy, I think.
18 A. Training Facility.
19 Q. Training Facility. I always get it wrong. We're going
20    to call it K-9, okay?
21 A. You got it. You got it.
22 Q. As well as Mr. Wilkes and Mr. Marks. Have you ever had
23    your deposition taken before?
24 A. Yes.
25 Q. Okay. How many times?

Page 5

1 A. I'm an expert witness in federal court.
2 Q. Okay.
3 A. So I've given quite a few depositions.
4 Q. Perfect. What are you an expert witness in? What's
5    your expertise?
6 A. K-9.
7 Q. Okay.
8 A. K-9 use, K-9 training, search and seizure.
9 Q. Okay. So I don't have to review the rules with you, do
10    I?
11 A. That's up to you.
12 Q. So far you're doing just fine as I think I am, too, but
13    the minute we start talking over each other, Joanne
14    will remind us not to do that. You obviously have to
15    answer yes, or no, or verbal answers.
16 A. Yes, yes.
17 Q. And, again, if I remind you and say is that a yes or a
18    no, I'm not trying to be rude. I'm just trying to make
19    sure we have a clear record.
20 A. Understood.
21 Q. Other than as an expert witness, have you ever
22    testified in deposition or court?
23 A. In court, several times. I was a law enforcement
24    officer for 29 years and eight months.
25 Q. But who's counting?

Page 6

1   A.   Yes. I'm retired from there.
2   Q.   Okay.
3   A.   And, yes, I have testified in court several times.
4   Q.   Have you been a party to a lawsuit?
5   A.   Yes.
6   Q.   Okay.  As a defendant, or plaintiff, or both?
7   A.   Both.
8   Q.   All related to your law enforcement career?
9   A.   Correct.
10  Q.   Okay.  When's the last time you were a party to a
11       lawsuit?
12  A.   Are you talking about somebody that hired me as an
13       expert?
14  Q.   No, not an expert, but where you were a party.
15  A.   Oh, boy, that would probably have been about 25, 26
16       years.
17  Q.   Okay.  Have you been a party -- I assume you have not
18       been a party to a lawsuit.  When I say party, I mean
19       either a plaintiff or defendant since retiring from the
20       force?
21  A.   No.
22  Q.   What's your educational background, sir, briefly?
23  A.   High school education, two years of college, and then,
24       of course, several classes for law enforcement.
25  Q.   Sure.

Page 7

1   A.   Throughout the years. Also, I was a firefighter for 15
2        years. We were public safety in Highland Park in the
3        beginning of my career.
4   Q.   Okay.
5   A.   So I've been through the fire academy, and those kind
6        of things. So that's pretty much it.
7   Q.   Okay.  Where did you serve as a law enforcement
8        officer?
9   A.   So my career started in the City of Highland Park. I
10       did 15 years there.
11  Q.   Okay.
12  A.   And then I went to the City of Wayne, and I did just
13       under 15 years there where I retired.
14  Q.   Okay.  Perfect.  Well, thank you for your service.
15  A.   Well, thank you.
16  Q.   I have enormous respect and family members who are
17       law enforcement.
18  A.   Thank you.
19  Q.   I think you guys are pretty good. So that's close to a
20       30 year career in law enforcement. Was part of that --
21       and I assume since you're an expert, the answer's going
22       to be yes, but was part of that as a K-9 officer?
23  A.   Yes, just over 25 years of my law enforcement career I
24       was a K-9 officer.
25  Q.   Okay.

Page 8

1   A.   For both departments.
2   Q.   All right. And what does that entail?
3   A.   Well, that entails the position being posted by the
4        department, and I did get it, of course, to start my
5        career back in 1983 when I started as a K-9 handler,
6        and was a K-9 handler ever since.
7   Q.   There you go. Did you undergo training to become a K-9
8        handler?
9   A.   I did.
10  Q.   Through the department or outside entity?
11  A.   They paid an outside entity, and it was K-9 Academy.
12  Q.   Okay.
13  A.   The previous owners, and I trained with them until they
14       retired for approximately, oh, 15 years. And then I
15       took over K-9 Academy when they retired.
16  Q.   So was there a time period in there where you were both
17       in charge of K-9 Academy, or owner?  Is it owner?  Is
18       that what you are?
19  A.   Ys.
20  Q.   The owner of K-9 Academy, as well as a law enforcement
21       officer?  Did they overlap?
22  A.   Yes.
23  Q.   Okay.  For how long a period of time?
24  A.   I took the business over in 2002.
25  Q.   Okay.

Page 9

1   A.   And I retired as a law enforcement officer in 2010. So
2        seven years I was the owner, and law enforcement.
3   Q.   Perfect. Where does your service as a fireman fit in?
4   A.   So in Highland Park, I started as a police officer.
5        Highland Park was the first urban police department
6        that went public safety. In other words, they were
7        firemen and policemen, so I was part of that.
8   Q.   And you gave that up when you went to work for Wayne,
9        right?
10  A.   Yeah, Wayne was solely just law enforcement.
11  Q.   According to the State of Michigan, and I'm not going
12       to put this as an exhibit, we talked about -- let's
13       talk a little bit more about K-9. And it has you as the
14       registered agent. Are you also an officer of the --
15       principal of the LLC, I assume, since you're the owner;
16       is that a fair statement?
17  A.   Correct.  That's a fair statement.
18  Q.   Are there any other officers or management members of
19       K-9?
20  A.   Yes, my wife.
21  Q.   Okay.  What position does she hold?
22  A.   She's a co-owner, and she's also a master trainer.
23  Q.   Okay.  Where'd she get her experience?
24  A.   Well, she had started -- before her and I met, she was
25       showing dogs. And then when I took the business over, I

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 10

1  needed somebody to run my civilian obedience portion of
2  the business, and she was recommended, and she came in,
3  and it all worked out that she was very well
4  experienced into the obedience area, and I hired her.
5  Q. And then you married her on top of it?
6  A. And then I married her.
7  Q. That's a nice story. And that's been since 2002, right?
8  A. Well, she actually came on in 2004.
9  Q. Okay. Looking at the corporate website with the State
10  of Michigan, I see that you are the president and
11  registered agent of National Association of
12  Professional Canine Handlers?
13  A. That is correct.
14  Q. Is that known as NAPCH?
15  A. Yeah. When people refer to us, they say NAPCH, which
16  is just the acronym for that.
17  Q. Okay. Okay if we use that today?
18  A. Okay.
19  Q. I like shortcuts.
20  A. Sure.
21  Q. So when was NAPCH established?
22  A. NAPCH was established -- we started putting it
23  together. It is a canine organization international in
24  nature. We do have Canadian and US handlers. We started
25  to put that together in 2003, and then it was

Page 11

1  incorporated in 2004. We are a 501(c)(3) nonprofit. And
2  I got voted in as the president of the organization.
3  There was five of us that put the organization
4  together.
5  Q. Okay.
6  A. And then I was voted in to be the president.
7  Q. And have you remained in that position since 2004?
8  A. Yes.
9  Q. Okay. With the state, there are other names listed as
10  officers, a Bryan Szostak?
11  A. Yes. He's a treasurer.
12  Q. Is he still?
13  A. Yes.
14  Q. Is he employed outside of NAPCH as a K-9 handler, or
15  what does he do professionally?
16  A. He actually just retired two weeks ago from the Canton
17  Police Department. But to answer your question, yes,
18  he was a K-9 handler and retired.
19  Q. What about Bruce Shippe?
20  A. Bruce Shippe is my secretary. And he is a retired
21  Garden City officer, K-9.
22  Q. Okay. And does your wife hold any kind of official
23  position with NAPCH?
24  A. Just the master trainer status.
25  Q. Okay. Any other officers or directors other than the

Page 12

1  gentlemen we just talked about?
2  A. We do have an entire board.
3  Q. Okay.
4  A. One that's on the board now is James Hilton. He's a
5  vice president of Canada. I have Al Daisley. He is the
6  vice president of the U.S. I have Al Gill who is my
7  accreditation officer. I have David Stone, who's a
8  trustee. I have Steve Miller, who's a trustee. I hope
9  I'm not forgetting somebody. That's it.
10  Q. Okay. Are these, these officer positions, are they
11  paid position?
12  A. They are not paid positions. None of our positions are
13  paid.
14  Q. Do you have a salary that's generated by NAPCH? I'm
15  not asking what it is. Do you have one?
16  A. No, no.
17  Q. Do you have a salary generated by K-9?
18  A. Yes.
19  Q. Okay. So you're an actual employee of K-9?
20  A. Well, my wife and I being that we are owners.
21  Q. Right.
22  A. Once all of every year the taxes are done, and
23  everything that has gone out, then it is what is
24  considered profit is split between my wife and I, and
25  that is considered our salary.

Page 13

1  Q. Okay. Are there any other employees, and I use that
2  term, employees, of K-9?
3  A. There is no other employees.
4  Q. Are there actual employees of NAPCH other than these
5  officers and directors?
6  A. No.
7  Q. So is there anybody on payroll from NAPCH?
8  A. No.
9  Q. Is there anybody working as an independent contractor
10  with NAPCH?
11  A. No.
12  Q. And you said there's no employees, using that term of
13  art, with K-9, correct?
14  A. Correct.
15  Q. Are there independent contractors?
16  A. Yes.
17  Q. How many independent contractors does K-9 have at this
18  point in time?
19  A. Five.
20  Q. And who are they?
21  A. That would be Mark Wilkes, Danny Mack, Bruce Shippe,
22  Mark Kay.
23  Q. Kay?
24  A. Yes, K-A-Y.
25  Q. No E?

4 (Pages 10 - 13)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 14

1  A. No E, yeah.
2  Q. And?
3  A. Wendy Bemis.
4  Q. B-E-M-I-S?
5  A. B-E-M-I-S.
6  Q. Is Wendy Bemis from Troy, by any chance?
7  A. No, she's from downriver, and she is one of my wife's
8     instructors.
9  Q. Okay. Bemis is a family name, long time family name in
10    Troy that we have an elementary school after.
11 A. I'll ask her next time I see her.
12 Q. It's a unique enough name. I thought must be a Troy
13    lady. So as to our two named defendants, Mr. Wilkes and
14    Mr. Mack, they are both independent contractors with
15    K-9?
16 A. Correct.
17 Q. How long has Mr. Wilkes been an independent contractor
18    with K-9?
19 A. Seven years.
20 Q. What about Mr. Mack?
21 A. Five years.
22 Q. When did you first meet Mr. Wilkes?
23 A. I met Mr. Wilkes when he became a K-9 handler for the
24    Dearborn Police Department. He trained through our
25    facility. Oh, my gosh. That was even before I took over

Page 15

1     the company, so it was that many years ago. So that
2     would have been probably 25 years ago.
3  Q. Okay. Did you have anything to do with training him
4     when he became a K-9 officer?
5  A. I did.
6  Q. Was that through K-9?
7  A. Correct. I was a trainer for K-9 Academy before I
8     became the owner.
9  Q. Sure. So at that time that Mr. Wilkes would have been
10    trained, you were just training, not only owning, too,
11    right?
12 A. That is correct.
13 Q. Same questions as to Mr. Mack. When and where did you
14    meet Mr. Mack?
15 A. So I met Mr. Mack when he came to K-9 Academy as an
16    Allen Park officer K-9. And same circumstance. I was
17    a trainer assisting at the time, and that's when I met
18    him.
19 Q. To your knowledge, is Mr. Wilkes still an active police
20    officer?
21 A. He is retired.
22 Q. What about Mr. Mack?
23 A. Same, retired.
24 Q. Was Mr. Wilkes, was he an active police officer when he
25    became a trainer for K-9?

Page 16

1  A. Yes.
2  Q. Okay. Was Mr. Mack, same question?
3  A. Correct, yes.
4  Q. Are any of the other independent contractors, Mr.
5     Shippe, Mr. Kay and Ms. Bemis, are they still -- not
6     Ms. Bemis, but Mr. Shippe and Mr. Kay, are they still
7     active law enforcement officers?
8  A. They are not.
9  Q. Are they retired as well?
10 A. Correct.
11 Q. Does K-9 offer services to the public?
12 A. Yes.
13 Q. What services are offered?
14 A. That would be the civilian obedience portion that my
15    wife teaches.
16 Q. And when I say the public, could I take classes through
17    K-9?
18 A. Yes.
19 Q. As a dog owner?
20 A. Yes.
21 Q. I wish I'd known that a while ago. That's not true.
22    She's wonderful. So if just a regular citizen comes to
23    K-9, what am I hopping to learn when I come to K-9?
24 A. Well, we like to say we're teaching the owner more than
25    we're teaching the dog. It's just about understanding

Page 17

1     the animal, know how to communicate with the animal,
2     how to do things in a humane manner. So our obedience
3     course is four weeks in length, one night each week,
4     two hour sessions each time. And it is very popular. We
5     don't even advertise. We do everything by word of
6     mouth, and we're full each month. But it has to do with
7     basically teaching the owner on what to do properly
8     and, like I said, in a well humane manner.
9  Q. Okay. And that class is taught by Mrs. Foley and Ms.
10    Bemis?
11 A. That is correct.
12 Q. Are those classes taught by the other gentlemen?
13 A. Dan Mack does assist my wife on two of the nights,
14    because there's three different classes going on. So,
15    yes, he does assist.
16 Q. I see, okay. Mr. Wilkes does not?
17 A. He does not.
18 Q. And the other two gentlemen do not?
19 A. Do not.
20 Q. Any other services offered to the general public?
21 A. No, that's it.
22 Q. Does K-9 provide services to companies or law
23    enforcement agencies?
24 A. To law enforcement agencies and companies, yes.
25 Q. Okay. I don't need to know all of them, but

5 (Pages 14 - 17)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 18

1 approximately how many law enforcement agencies utilize
2 your services, K-9 services?
3 A. Currently I have 38 law enforcement teams that are
4 training out of the facility.
5 Q. Okay.
6 A. It's called maintenance training.
7 Q. Okay. And are those all US or some Canada?
8 A. They are all US.
9 Q. All Detroit area?
10 A. Yeah, Southeast Michigan is a good way to put it.
11 Q. Okay. And what constitutes, I believe you said,
12 maintenance services or maintenance training?
13 A. So the officers come to us for their initial training
14 where they're starting out. When they're completed
15 through that course, which is three months long, then
16 they go to what we call maintenance training.
17     And what we try to do is we're fulfilling a
18 federal guideline, if you will, that for a working dog
19 that they maintain their training a minimum of 16 hours
20 a month, and this was a recommendation from the US
21 Supreme Court. We try to follow those guidelines.
22 Q. Okay. So is it fair to say that there is a -- for as
23 long as the dog, in particular, is a K-9 security dog,
24 that dog is going to have a relationship with K-9?
25 A. Correct.

Page 19

1 Q. I mean, it may change handlers, correct?
2 A. It may, yes.
3 Q. But if I'm understanding your testimony correctly, once
4 the dog is registered as a recipient of the training at
5 K-9, that will extend as long as the dog is operating
6 in that position, correct?
7 A. It is extended as long as the customer, who is the
8 actual department, keeps that going, so yes.
9 Q. Other than law enforcement agencies, who else, not just
10 the general public, but who else uses your -- uses K-9
11 services in their businesses?
12 A. I also do hospital training, and I do private security
13 training.
14 Q. And how many hospitals are you currently affiliated
15 with?
16 A. I have 31 hospital teams at this moment.
17 Q. Does that mean 31 different hospitals?
18 A. No. That could mean that a hospital may have multiple
19 teams.
20 Q. Okay.
21 A. But that's 31 teams total.
22 Q. Okay. So break it down for me, if you would, how many
23 hospital systems is K-9 providing service to. And if
24 you can name those off for me.
25 A. So I have Henry Ford, and Henry Ford has many different

Page 20

1 locations. I have Trinity that has many different
2 locations. I have Providence that has a couple
3 different locations. I have St. John's that has a
4 couple different locations. I have McLaren that has
5 multiple locations. Ascension, and I believe that's it.
6 Q. Beaumont Corewell?
7 A. They're no longer training with me. You said at the
8 time.
9 Q. There was a point in time where Beaumont Corewell was
10 training with you, correct?
11 A. Correct.
12 Q. When did that cease?
13 A. It was effective February the 5th.
14 Q. Of this year?
15 A. Correct.
16 Q. Did you end that relationship or did --
17 A. I did not. They did.
18 Q. Okay. Do they no longer, Beaumont, and I know it's
19 Corewell, or something like that. We'll call it
20 Beaumont, because that's what it is.
21 A. Okay.
22 Q. Did Beaumont cease having a K-9 security force?
23 A. No. According to their letter that I received, they
24 were just going in a different avenue of trying to
25 standardize their K-9 program for the entire Southeast

Page 21

1 Michigan that included Grand Rapids, Muskegon, those
2 areas. And that's what I understood.
3 Q. As they are expanding, ever expanding?
4 A. Correct. They thanked me for my service, but they were
5 going in this direction.
6 Q. Does K-9 -- do you have a competitor, or have you
7 pretty much cornered the market?
8 A. No. There are other training academies or locations
9 throughout Southeast Michigan. When I say there's not
10 many, probably three or four.
11 Q. Okay.
12 A. Yeah.
13 Q. Can you think of, because I can't as I'm sitting here,
14 can you think of a hospital system other than Beaumont
15 that is not doing business with K-9?
16 A. Not that I'm aware of.
17 Q. Okay. So fair to say you pretty much cornered that
18 market at least?
19 A. Well, I'm doing okay.
20 Q. Congratulations. Congratulations.
21 A. Thank you.
22 Q. I'm glad. Same question as to the law enforcement. Are
23 there many law enforcement agencies that don't utilize
24 K-9's programs?
25 A. Yes.

6 (Pages 18 - 21)

Carroll Reporting & Video
A Veritext Company

www.veritext.com

586-468-2411
www.veritext.com

Page 22

1  Q.  Do they go through your competitors then?
2  A.  They do.
3  Q.  I see. What about corporate security companies that you
4     mentioned?
5  A.  I don't have any corporate security companies right
6     now. I've had a couple of private owned security
7     companies come to us.
8  Q.  I think I misquoted you.
9  A.  That's fine.
10  Q.  You have companies or entities that are not law
11     enforcement, and not hospital systems.  How many of
12     those types of relationships do you have?
13  A.  Four.
14  Q.  Okay.  And who are they?
15  A.  Again, they're just private companies that do detection
16     work for their own, you know, type of work, I guess.
17  Q.  Okay.  And so there's just four of those?
18  A.  Yes.
19  Q.  It's not one entity that has four or five different
20     teams?
21  A.  Correct, correct.
22  Q.  Okay.  So with all of these people that you train both
23     individual -- just let's not focus on the individual
24     like someone like me that your wife and Ms. Bemis are
25     training.  Focus in only on the hospitals and the law

Page 23

1     enforcement agencies, how many dogs and dog handlers is
2     K-9 working with as we sit here today?
3  A.  So we have 64 teams that are training out of the
4     facility right now.
5  Q.  Okay.  And that incorporates all of the --
6  A.  Correct.
7  Q.  -- hospitals and the law enforcement we just talked
8     about?
9  A.  Yes.
10  Q.  So when you say 64 teams, how many dogs?  Is that 64
11     dogs?
12  A.  Yes, you're correct.
13  Q.  Okay.
14  A.  I'm sorry. I should have been specific to tell you a
15     team is a handler and a dog.
16  Q.  I should have asked that question.
17  A.  That's okay.
18  Q.  Thank you for clarifying. So when handling that many,
19     how many dogs and K-9 handlers do you average per week?
20  A.  Each of them have different maintenance schedules, so
21     I'll have anywhere from 30 to 40 teams a week.
22  Q.  And because they're all on different maintenance
23     schedules, it varies as to who's showing up in any
24     particular week, right?
25  A.  Correct.

Page 24

1  Q.  Since you took over the business in the early 2000s,
2     2002, I think you said, have you received, you know, as
3     president of K-9, owner of K-9, any complaints
4     regarding how dogs are being trained?
5  A.  Yes.
6  Q.  How many times has that happened?  Ballpark it for me.
7  A.  Four or five.
8  Q.  Have you received complaints about how Mr. Wilkes works
9     with dogs?
10  A.  No.
11  Q.  Have you received complaints about how Mr. Shippe
12     works, did I say that right?
13  A.  No.
14  Q.  No. How about Mr. Kay?
15  A.  No.
16  Q.  Mr. Mack?
17  A.  No.
18  Q.  What is the basis of the complaints?
19  A.  The complaints that I received were from actual
20     citizens who saw new handlers walking around their
21     neighborhoods, and they didn't care for the corrections
22     that they were giving on the training collar around the
23     dog's neck. So they would call me and make their
24     complaint that they felt that the person was abusing
25     the dog.

Page 25

1  Q.  Okay.  So these complaints are not about your trainers.
2     They're complaints about the trainees, the handlers?
3  A.  Correct.
4  Q.  Okay.  Have you had any complaints about Mr. Mack
5     regarding his handling of dogs, or his training of the
6     dogs?
7  A.  No.
8  Q.  With the trainers you have now, and the trainers that
9     you've had previously, have there been any complaints
10     about any of your trainers use of choke collars, or the
11     way they have handled the dogs?
12  A.  No.
13  Q.  Have you received any notifications from the State of
14     Michigan regarding allegations of cruelty to animals at
15     your facility?
16  A.  No.
17  Q.  Is there a process or training course for new trainers
18     and dogs?
19  A.  So the training course is actually the course that we
20     put on from the beginning of the officer and through.
21     And then if a handler wants to take what we call to the
22     next level, they then start participating in assisting
23     the trainers and master trainers at the facility. So
24     they're learning the system even more, if you will, by
25     assisting training and teaching other officers.

7 (Pages 22 - 25)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 26

1  Q.  What's the percentage, if you ballpark it, of handlers
2      who take that next step?
3  A.  Well, I believe I have 13 or 14 trainers right now with
4      NAPCH from my group, and I have seven master trainers
5      from my group.
6  Q.  And when you are referring to them as trainer or master
7      trainer, are they just functioning with their own dog
8      training their own dog?
9  A.  No.  Like I was explaining to you, they have taken this
10     to another level.
11 Q.  Okay.
12 A.  And assisting the teaching of other dogs.
13 Q.  Oh, other dogs as well, not just -- I misinterpreted,
14     misunderstood. It's not just assisting with the
15     training of their own dog?
16 A.  Correct.
17 Q.  Okay.
18 A.  That is correct.
19 Q.  And other than, you know, just wanting to do that for
20     personal growth, or whatever motivates that person, is
21     there criteria that they need to fulfill to be accepted
22     into that position?
23 A.  Yes, yes.
24 Q.  And what is that?
25 A.  So there is criteria that is laid out by NAPCH to

Page 27

1      become a recognized trainer, and a recognized master
2      trainer. So there are guidelines on that. And I have
3      been following those guidelines before even NAPCH, so
4      they were kind of incorporated through that.
5  Q.  Have they been taught to you, or where do those
6      guidelines come from?
7  A.  Those guidelines come from the executive board who
8      makes the decision on guidelines when it comes to
9      trainers and master trainers, and then it's voted on by
10     the membership.
11 Q.  Are there regulations, or laws, or hierarchy that NAPCH
12     relies on to create these expectations and these
13     guidelines?
14 A.  There are no regulations or laws, but there are other
15     organizations.  And we, of course, are involved with
16     other organizations, and follow what they do or do not
17     do, and incorporate that with our organization, too, if
18     it benefits the members.
19 Q.  Does NAPCH have -- is there a hierarchy?  Is there an
20     organization that NAPCH itself reports to?
21 A.  No.
22 Q.  That supervises NAPCH?
23 A.  No. Other than, you know, the only governing is the
24     courts, meaning that the Supreme Court has made some
25     recommendations when it comes to working dog

Page 28

1      guidelines.
2  Q.  Okay.
3  A.  That's where I was telling you about the 16 hours of
4      maintenance.
5  Q.  Right.
6  A.  You know, and it mainly has to do with training and
7      continual training. And then, of course, there's laws
8      about use of force when it comes to a dog. And then
9      there's also criteria when it comes to search and
10     seizure when they can, when they cannot. So there are
11     laws, if you will. But, again, this was made by the
12     governing body, right.
13 Q.  Right. So I must have worded my question awkwardly.
14     That's where I was headed. There's something upon which
15     you and your colleagues at NAPCH relied on to create
16     the regulations that govern your particular
17     organization, fair enough?
18 A.  Fair enough, yes.
19 Q.  You didn't just make it up like this is a good idea?
20 A.  Correct, correct.
21 Q.  There's laws, there's regulations, or there is
22     opinions, you know, from the Supreme Court and others?
23 A.  Yes.
24 Q.  As to what criteria you should meet?
25 A.  That is correct. And it's always adjusting.  As we

Page 29

1      know, times change. So when something changes, then we
2      have to make sure we're meeting that, and that the
3      officers follow with what has been changed.
4  Q.  Does anyone -- is there an entity that audits you that
5      checks up to make sure that NAPCH is doing what you say
6      that they're doing, or is it a self audit?
7  A.  It's a self audit.  But there is a part where the court
8      will or will not recognize the organization. And NAPCH
9      is recognized.  In giving a deposition on a case
10     involving one of our members to the appellate court,
11     the appellate court ruled that NAPCH would be
12     recognized as an organization, and took the testimony,
13     is a good way to put it.
14 Q.  Is that a case that you were involved in as an expert
15     witness?
16 A.  Correct.
17 Q.  Okay. And what was the basis of that particular case?
18 A.  It was a use of force case from a department, one of
19     our members, on a person. And they wanted -- before
20     they took my testimony, they wanted to be able to
21     recognize and establish the organization as being
22     recognizable, and they did.
23 Q.  As part of your qualification as an expert, I assume?
24 A.  Correct.
25 Q.  Okay. And this was a citizen suing a law enforcement

8 (Pages 26 - 29)

Page 30

1    agency for excessive force?
2 A. Correct.
3 Q. With the use of a K-9?
4 A. Correct.
5 Q. Is that the majority of what your expert witness
6    testimony is in cases like that, excessive force, or
7    improper use of their K-9?
8 A. That is a good portion of it, yes.
9 Q. What else would there be?
10 A. Well, there's always search and seizure issues, you
11    know, whether or not you could use a dog, or can use
12    the dog, those kind of things. And that's pretty much
13    it, yeah.
14 Q. At K-9, are there experienced trainers working with new
15    dogs?
16 A. Yes.
17 Q. Are there new trainers working with experienced dogs?
18 A. Yes.
19 Q. Are there experienced trainers working with experienced
20    dogs where they just happen to be new to each other?
21 A. I don't believe they would be new to them, no. They
22    probably know them.
23 Q. Does the training course that you've talked about
24    anticipate an end date, or can it just be -- or is that
25    something that is elected by the handler or by his or

Page 31

1    her employer?
2 A. So I'm trying to understand your question.
3 Q. Let me reword it if you don't. I want to make sure you
4    do. Does there come a time where you'll get a trainer
5    and a dog. And unless you want to just hang around,
6    you're done? You know, congratulation. You graduated.
7    Go do your thing?
8 A. So we don't make that decision, because the handler is
9    not my customer, if you will. It's the law enforcement
10    department or the hospital. Yes, we have brought up to
11    my customers, if you will, if we're having an issue
12    with a handler, or we think there's something that they
13    should know, but they make the ultimate decision. I
14    don't hire, fire, do anything like that with a handler.
15 Q. K-9 and NAPCH are located at the same address, correct?
16 A. Yes, they are.
17 Q. Other than sharing the same address and the interest in
18    K-9, is there more to the relationship between K-9 and
19    NAPCH?
20 A. No. They're two separate entities, if you will.
21 Q. Okay.
22 A. The board voted to have NAPCH at the K-9 building for a
23    place to store their files. And some of the board
24    members who live close enough can come there. There are
25    some board members who live in Canada or other states

Page 32

1    who don't come there. But it's just an office location
2    is a way to put it.
3 Q. Okay. When someone becomes a handler, a trainee, if
4    you will, at K-9 with his or her dog, does that
5    automatically make them a member of NAPCH?
6 A. No.
7 Q. Tell me the process, if I'm a new trainer for a law
8    enforcement, and it's like, okay, take the dog and go
9    over to K-9 and get trained. Is NAPCH even aware that I
10    have shown up and, if so, how do I become a member of
11    NAPCH, if I want to, by being a trainer at K-9?
12 A. So with all the training facilities, including my own,
13    NAPCH does not know somebody that's just starting out.
14    In other words, part of our bylaws is is that once they
15    have completed a training course and become a paid K-9
16    handler, which means they are on the road with a dog,
17    or utilizing the dog as a team, then they can become a
18    NAPCH member, which they then fill out membership
19    applications, pay the membership dues, and then they're
20    a NAPCH member.
21 Q. Is that by invitation, or by application, or how does
22    that happen?
23 A. It is by application.
24 Q. And how long into someone's training does that
25    typically happen where they --

Page 33

1 A. Well, that's according to wherever they're training.
2    For me, my course is three months in length.
3 Q. Okay. I'm talking about, in particular, the training
4    that Mr. Maul went through. Let's just focus there?
5 A. Okay.
6 Q. There's probably a lot of other different variables
7    with other training opportunities. But if I, you know,
8    if I'm coming from a hospital system like Mr. Maul did,
9    and I'm already an employee of that hospital system,
10    and I want to be, you know, a K-9 handler, K-9
11    security, and they send me to K-9 -- there's too many
12    K-9s in that sentence. They send me to your business,
13    K-9, to get training, under normal circumstances, the
14    best circumstances, how long do I have to train before
15    I am eligible to become a NAPCH member?
16 A. 16 weeks.
17 Q. Okay. And other than attending the training, is there
18    any kind of test or evaluation that I go through to
19    qualify to possibly become a member of NAPCH?
20 A. The only requirement in the bylaws of NAPCH is that you
21    are a paid K-9 handler.
22 Q. Okay. So let's assume that I am, I'm a paid K-9
23    handler.
24 A. If you put the application in, yes, you become a
25    member.

9 (Pages 30 - 33)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 34

1  Q.  And once I become a member, am I assigned a
2      certification number?
3  A.  No.
4  Q.  Is there some sort of certificate that I'm awarded?
5  A.  So there is a certification that the handler can go
6      through. There are certification rules. There is
7      nothing in the bylaws that says a member has to
8      certify. But we do have certification available in the
9      organization, and we post all of the requirements for
10     each area that they would like to be certified in, and
11     they must pass in order to get that certification.
12 Q.  Okay.
13 A.  If they do that, and they do pass, then they get a
14     certification certificate.
15 Q.  Okay. And they're assigned a certification number, I
16     assume?
17 A.  The certificate has a number on it. That's not actually
18     their number. It's just the certificate number.
19 Q.  Okay. Where are the certificates maintained?
20 A.  At the Hayes Street office address.
21 Q.  But is it maintained by NAPCH or by K-9?
22 A.  NAPCH.
23 Q.  Okay. So is there a -- is there any retention at K-9
24     of the certificate that one might earn?
25 A.  Yes.

Page 35

1  Q.  Okay. Is the employee, the trainee, the handler
2      provided with a copy of the certificate or
3      certification?
4  A.  Yes.
5  Q.  But there's also one on-site, correct?
6  A.  Just a copy, yes.
7  Q.  And you don't get that certification, if I understand
8      your testimony, unless you pass certain qualifying
9      markers, correct?
10 A.  Correct.
11 Q.  And where are those delineated? Where are they
12     written? How would a trainee handler who aspires to
13     become the best handler that he or she can be, and get
14     a certification, is there a book? Is there a website?
15     Is there something that says these are the areas that
16     you have to pass before you get your certification?
17 A.  So there is a training agenda that the handlers are
18     provided in a book. They are provided a notebook, and
19     it has all of the areas of training and what would be
20     expected of them.
21 Q.  Okay. Is that found on the website, NAPCH website at
22     all?
23 A.  We're talking two different things now. NAPCH is
24     separate from K-9 Academy. You were asking K-9.
25 Q.  Okay. Fair enough. The training notebook is K-9?

Page 36

1  A.  Correct.
2  Q.  Okay. The certification is NAPCH?
3  A.  Yes. And that is on the website. We do put everything
4      on our website so we're transparent.
5  Q.  I see. So tell me more, please, about the training
6      agenda notebook? Is that something that is provided by
7      K-9 to all trainees?
8  A.  Correct.
9  Q.  And in that notebook, it delineates the areas that one
10     would have to be successful in or qualify in in order
11     to get certification, correct?
12 A.  Correct. It's the entire training program.
13 Q.  Is a record kept, some sort of written record kept on
14     every trainee handler as to how they qualify for each
15     individual criteria?
16 A.  Each individual officer is provided a username and
17     password, as I have a program that assigns each officer
18     for training documentation.
19 Q.  And that's maintained at K-9?
20 A.  Yes.
21 Q.  And what is kept on that program other than -- go
22     ahead.
23 A.  There is --
24 Q.  You tell me instead of my guessing. It's easier.
25 A.  So we keep attendance of who's attending. Each officer,

Page 37

1      each handler is assigned their own location in order to
2      do training reports, as training reports documentation
3      is very important to the courts. So we provide this
4      program to them to keep that. My master trainers, who
5      were instructing that particular day, will also put in
6      there the agenda for the day, what was done. And then
7      the officers have access to all of that.
8  Q.  So for each task or each element, we use it in legal
9      terms, that has to be accomplished in order to achieve
10     certification, is there some sort of evaluation or test
11     that they go through to say, okay, I passed the
12     explosives section. Who makes the determination how
13     they have accomplished that particular section?
14 A.  So the testing doesn't start until the end of the
15     course, okay?
16 Q.  At 16 weeks?
17 A.  16 weeks. And then we have two master trainers who
18     conduct those testing.
19 Q.  Is it always the same ones?
20 A.  It is not always the same ones.
21 Q.  And how do they -- is it handling testing, or is it
22     paper testing? How is somebody tested?
23 A.  They are tested through each area that they have been
24     trained in. So the handlers are already aware of what
25     is going to be on this test. It's going to see where

10 (Pages 34 - 37)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 38

1    they are at, if they're able to accomplish after the 16
2    weeks to perform what they were taught.
3    Q.  Okay.  So it is performance, okay.  Is there a paper
4        test as well, a written test?
5    A.  No.
6    Q.  Do you recall how many sections, how many tasks have to
7        be accomplished successfully in order to achieve
8        certification?
9    A.  For law enforcement they have to complete seven.  For
10       hospitals, they have to complete four.
11   Q.  Okay.  So just to summarize, just to make sure I
12       understand.  They can't do this until the end of 16
13       weeks?
14   A.  Correct.
15   Q.  They have to finish 16 weeks.  Then they have to work
16       with trainers, and then prove themselves competent, if
17       you're working with a hospital, in four different
18       areas?
19   A.  Areas.
20   Q.  What are those four?
21   A.  So that would be obedience, aggression control,
22       building search, and detection.  I have some dogs that
23       are narcotic detection dogs, and I have some dogs that
24       are explosive detection dogs.
25   Q.  Okay.  And once I as a trainee pass these four

Page 39

1    sections, and am entitled to certification, who
2    notifies -- or, first of all, the people that are doing
3    the training evaluation to make sure that I pass these
4    four sections, they're K-9 trainers, right?
5    A.  Correct.
6    Q.  How does it then get -- how does NAPCH then get
7        notified that Teri Gorman has passed all of these
8        sections, she's completed her 16 weeks, and she's
9        deserving of certification at NAPCH?
10   A.  So the only thing that NAPCH is notified of is that
11       they are a paid K-9 handler, and they've completed a
12       program.
13   Q.  Okay.
14   A.  Okay.  Once that's done, then a master trainer from
15       NAPCH will perform the certification, if that's what
16       they want.
17   Q.  Right.
18   A.  Okay.
19   Q.  Is there ever a time that you can recall where NAPCH
20       has said no?
21   A.  You mean failed?
22   Q.  No.  Where NAPCH has said no to somebody who has done
23       what I just said I did.  I took these four.  I passed
24       all these sections, and I was there 16 weeks, and the
25       person training me and testing me says, yeah, Gorman's

Page 40

1    done all these.  Is there a way that NAPCH can say, no,
2    we don't think so, or disagree with that evaluation?
3    A.  No.
4    Q.  Okay.  Do you have trainers, handlers who just don't
5        bother trying to become NAPCH members?
6    A.  I have not, because most of the customers that I have
7        require them to also belong to NAPCH.
8    Q.  So that's an employer decision of, you know, you're
9        going to go through this training, and you're going to,
10       you know, achieve success?
11   A.  It's obviously better on their resume when they can
12       show that they have two certifications instead of just
13       one.
14   Q.  Sure.  What do you mean two instead of just one?
15   A.  One from K-9 Academy, and one from NAPCH.
16   Q.  Okay.  You indicated that NAPCH requires some kind of
17       dues?
18   A.  Correct.
19   Q.  Who pays the dues?
20   A.  Either the customer or the handler.  I have them both
21       ways.
22   Q.  Okay.
23   A.  It doesn't matter to NAPCH where the money comes from.
24   Q.  As long as you get it, right?  I get it.  Is there a --
25       you indicated you kept copies of NAPCH.  Now we're

Page 41

1    going to talk NAPCH.
2    A.  Okay.
3    Q.  Put on a turn signal.  You indicated that you at NAPCH
4        keep a copy of the certification on file?
5    A.  Correct.
6    Q.  Okay.  Is there a written list of people that are
7        certified handlers, people that have the certification
8        and are NAPCH members?
9    A.  Yes.
10   Q.  And where would one find that?
11   A.  That is on the website under membership.
12   Q.  Okay.
13   A.  I believe there's close to 1,800 members right now.
14   Q.  Okay.  Is there a situation where the employer, the
15       Beaumont or the law enforcement agency is not insistent
16       upon the trainer receiving the certification or
17       becoming a member of NAPCH?
18   A.  I've never heard of an employer insisting they do not.
19   Q.  Okay.  Well, or not requiring it, let's call it that.  I
20       mean, can a person work as a K-9 handler, having gone
21       through your training, and working as a K-9 handler
22       without being certified or a member of NAPCH?
23   A.  Yes, they can.
24   Q.  Does that happen very often, to your knowledge?
25   A.  No.

11 (Pages 38 - 41)

Carroll Reporting & Video
A Veritext Company

www.veritext.com

586-468-2411
www.veritext.com

Page 42

1  Q.  But, to your knowledge, there's not a regulation, or a
2      law, or something that says you've got to be certified
3      before you can do this out in public?
4  A.  There is not.
5  Q.  Should there be?
6  A.  Yes.
7  Q.  The way you said that I had to ask that follow up.
8  A.  The one thing that the courts always rely on, if you
9      will, is the actual training. Certification's brought
10     up every now and then by the court, but they want to
11     know about the training and the continual training.
12 Q.  Sure.
13 A.  So that gets brought up a lot.
14 Q.  Once the trainee handler receives certification and
15     becomes a NAPCH member, is the employer, the hospital,
16     the law enforcement agency, informed by NAPCH that that
17     has occurred, or is that just up to the handler to --
18 A.  That is up to the handler to notify their employer.
19 Q.  There's not a letter that you send out or anything to
20     your client saying, by the way, Teri Gorman has passed
21     certification, and is now certified and a NAPCH member,
22     too?
23 A.  No, because NAPCH only requires a person to be a paid
24     dog handler. It doesn't care -- they're not certifying
25     the company. They're certifying the officer and the

Page 43

1      dog.
2  Q.  Okay. So let me make the question regarding K-9. Once,
3      you know, I pass this criteria, and I'm going to have
4      my certification issued by NAPCH, does K-9 talk to or
5      inform in whatever means the employer that their
6      handler has reached these goals?
7  A.  Yes. We keep in constant contact with the employer
8      during the training phase.
9  Q.  And what means of communication do you use with
10     employers?
11 A.  We are usually provided somebody that's in charge.
12     There may be a K-9 coordinator. They may be a
13     lieutenant, so on and so forth, and we keep in touch
14     with them to let them know progress, if there's any
15     problems, what we may be working on, those kind of
16     things. We also will set parameters for what the team
17     can and cannot do away from the facility during the
18     training for liability purposes.
19 Q.  Sure.
20 A.  So we are in constant contact, if you will.
21 Q.  When you say we, are you talking yourself? Are you
22     talking trainer?
23 A.  Most of the time it's myself, but my trainers do talk
24     with certain people. They even come to the facility to
25     watch their handler, and will talk to them, too.

Page 44

1  Q.  Are these communications documented? I mean, are they
2      written, or is it all by phone? What kind of
3      communication are we talking about?
4  A.  So all of the above, it may be documented if there was
5      some sort of issue that we needed to address.
6  Q.  Okay.
7  A.  If it's just a normal conversation that the handler's
8      doing fine, we're moving forward, those aren't
9      documented.
10 Q.  Are they diaried anywhere?
11 A.  They're put on their training on the training reports.
12 Q.  Okay. So if I'm doing the training, and I've
13     accomplished all these tasks that we talked about,
14     somebody from K-9 is going to contact my employer and
15     say Teri Gorman is now certified?
16 A.  Correct.
17 Q.  In some means of communication?
18 A.  Yes.
19 Q.  And when they make that communication with the person,
20     vice president of training or whatever the person's
21     title is at my employer, is it noted in my file, my
22     record?
23 A.  Well, the certification would be.
24 Q.  No, the certification is, but I'm talking about the
25     communication with my boss, with the employer.

Page 45

1  A.  No. That's not documented. But a lot of times the
2      employer wants to know, because they want to be present
3      the day they receive their certificate. Some do photo
4      ops, those kind of things. But it's not documented that
5      they were there, or when we presented the certificate,
6      or anything like that.
7  Q.  So do you have -- even if it's just -- is there --
8      strike that. Let's start over with this question,
9      because I'm going in 14 directions.
10         During this first 16 weeks, for example, is
11     there a reporting system between K-9 and the employer
12     saying, this is how she's doing. This is what we've
13     accomplished. Everything's going well. Or in the
14     reverse, the opposite, you know, we have some issues
15     here. We have problems here?
16 A.  Yes.
17 Q.  There's that kind of communication, correct?
18 A.  There is that kind of communication.
19 Q.  Is that kind of communication documented?
20 A.  Yes.
21 Q.  Where would I find that kind of documentation?
22 A.  In their training reports.
23 Q.  Okay. And when you say their training reports, are you
24     talking --
25 A.  The handler's. I'm sorry.

12 (Pages 42 - 45)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 46

1  Q.  Okay. In my individual --
2  A.  Each individual.
3  Q.  Okay.  And is that what you were talking about earlier
4      that file that's on me someplace?
5  A.  That is correct.
6  Q.  And that's maintained where?
7  A.  Two ways. First way is on the computer. I have a
8      program, and it is retained there. And then also we
9      tell the handlers and whoever's in charge that they can
10     also go on that site and make copies of those training
11     reports.
12 Q.  In this litigation, in Mr. Maul's litigation, have you
13     personally gone back or gone into the training reports
14     to see what's in his file?
15 A.  When this litigation started, I did go into his reports
16     to see what was there, yes.
17 Q.  Have you made copies of what's there?
18 A.  I did not make copies. I believe Mr. Wilkes made some
19     copies.
20 Q.  Some copies, or copies of the entire file?
21 A.  I'm not entirely sure. You have to ask Mark.
22 Q.  Will you agree with me that Mr. Maul achieved
23     certification?
24 A.  Yes.
25 Q.  Has there ever been an instance at K-9 and NAPCH,

Page 47

1      frankly, where a certification has been revoked?
2  A.  Yes.
3  Q.  And how many times has that happened in the history of
4      your ownership or working with K-9 or NAPCH?
5  A.  It has happened, well, geez, when you're putting a
6      number in it, 40, 50 times.
7  Q.  And that revocation, those revocations could come from
8      NAPCH, correct?
9  A.  So --
10 Q.  Your certification?
11 A.  There's two certifications. The NAPCH certification.
12     If they're no longer a paid K-9 handler, they cannot be
13     a member.
14 Q.  Okay.
15 A.  That's in the bylaws. If they left their department not
16     in good standing, they could lose their certification.
17     That's NAPCH now.
18 Q.  Okay. So let's take those one at a time. NAPCH
19     membership is only for active handlers.  Is that what
20     you said?
21 A.  It's for paid K-9 handlers, correct.
22 Q.  So I have to be employed?
23 A.  In order to become a NAPCH member.
24 Q.  And to maintain NAPCH membership, do I have to be
25     employed?

Page 48

1  A.  No.
2  Q.  Okay.
3  A.  If you've been a member in good standing, and you
4      retire in good standing, you can remain a member.
5  Q.  Okay.  What if I'm in good standing, but I just don't
6      feel like doing it for a while, and I leave the job
7      and, you know, go sell T-shirts someplace, and decide
8      to come back later, do I have to start all over?
9  A.  Yes. You would renew your membership at that point. But
10     when you're not a paid K-9 handler, you're not a
11     member.
12 Q.  So you're not going to be on that list on the website?
13 A.  Correct.
14 Q.  Are you aware of anybody who's listed on your website,
15     on the NAPCH website right now that is not actively a
16     paid handler employee, but still is on the list?
17 A.  So there is members on the list that may have retired
18     in good standing as a K-9 handler who would be on the
19     list.
20 Q.  You keep saying good standing. What do you mean,
21     please?
22 A.  So I have had members who were charged criminally, and
23     they're not removed immediately.  But if they are fired
24     or convicted, they are then not in good standing.
25 Q.  What about someone who just leaves their employment,

Page 49

1      isn't fired, hasn't done anything criminal, but leaves
2      their employment, would that be a threat to their good
3      standing?
4  A.  It is not a threat to their good standing. It's just
5      that they're not a paid K-9 handler, and they did not
6      retire as a K-9 handler. They just left.
7  Q.  Okay.
8  A.  So they, according to our bylaws, are not allowed to be
9      a member.
10 Q.  So when you say retired, you're actually talking giving
11     it up, retiring as you did with being the law
12     enforcement?
13 A.  Correct.
14 Q.  Or as my children keep inferring me to do with law, and
15     I haven't done it yet. But you mean you're talking
16     retirement as a term of art?
17 A.  Correct.
18 Q.  So is it your testimony that somebody who was working
19     at a law enforcement agency decided they don't want to
20     be a police officer any more, and wants to go work
21     someplace else and leaves, you know, on good terms with
22     the entity, but haven't retired from law enforcement.
23     They've just left that particular job, they don't get
24     to be on the membership log any more?
25 A.  That is correct.

13 (Pages 46 - 49)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 50

1  Q.  How long did K-9 enjoy a relationship with Beaumont,
2      how many years?
3  A.  10, eight to 10.
4  Q.  Did you at Beaumont have a particular contact person
5      that you dealt with relative to the K-9 handling?
6  A.  Yes.
7  Q.  Who was that?
8  A.  Whitney Guerber.
9  Q.  We talked about this a little bit, but I want to get
10     clarification. In talking specifically about Mr. Maul
11     now, who we agreed became a certified handler?
12 A.  Yes.
13 Q.  Did Beaumont have any input on whether or not he was
14     worthy of certification?
15 A.  I can't answer that. I don't know.
16 Q.  Under normal circumstances, would they have any input
17     in general terms?
18 A.  I'm trying to understand what you're saying. If he
19     wasn't worthy, I would have thought they would remove
20     him as a handler, so I don't know where to go from
21     there.
22 Q.  Is it a fair assumption that when Mr. Maul became
23     certified with K-9, that Beaumont approved it?
24 A.  Correct.
25 Q.  Does the employer have any input as to whether a K-9

Page 51

1      handler retains that certification that he or she got
2      from NAPCH, or is it just if the person's no longer
3      working there then there goes the NAPCH certification?
4  A.  Correct. If no longer being a paid K-9 handler, they
5      are no longer a member.
6  Q.  Do you recall personally meeting Tyler Maul?
7  A.  Yes.
8  Q.  How many times do you think you've interacted with him?
9  A.  I've seen him -- every week I would see him during his
10     training. Other than saying hello or, you know, those
11     kind of things, that was pretty much it. But every week
12     I would see him.
13 Q.  Do you know all of the handlers? I mean, do you make
14     it a point?
15 A.  Yes.
16 Q.  To know them?
17 A.  Yes.
18 Q.  You have a lot of people coming and going.
19 A.  Yes.
20 Q.  So you do make a point to know who they are?
21 A.  Correct.
22 Q.  And where they're from?
23 A.  Yes.
24 Q.  Did you personally one-on-one ever provide K-9 handling
25     to Mr. Maul?

Page 52

1  A.  No.
2  Q.  Did you personally witness Mr. Maul while he was
3      training at K-9?
4  A.  Yes.
5  Q.  If one of your trainers has a concern about the
6      qualifications, or the skill, or anything that's going
7      on with a particular handler, do they communicate that
8      to you in writing?
9  A.  They communicate it to me, and then it's documented on
10     the training report.
11 Q.  So is it fair to say that any kind of concerns that
12     someone would possibly have regarding anybody who's
13     training at K-9 is going to be documented on the
14     training report? Is that the bible? I mean, is that
15     where everything about that particular trainee is going
16     to be found?
17 A.  Correct.
18 Q.  Is there any other recordkeeping other than the
19     training report?
20 A.  No.
21 Q.  Did you personally ever have any conversation with
22     Whitney Guerber or anybody else at Beaumont Dearborn
23     specifically regarding Mr. Maul?
24 A.  Yes.
25 Q.  How many times?

Page 53

1  A.  I would say at least a half a dozen.
2  Q.  And were all of those conversations with Whitney
3      Guerber?
4  A.  Yes.
5  Q.  Were all of those conversations exclusively with
6      Whitney Guerber?
7  A.  Yes.
8  Q.  Were they all by phone?
9  A.  No. Each time was in person.
10 Q.  Where?
11 A.  At K-9. She attended many, many days.
12 Q.  Okay. Did you take any notes or create any kind of, you
13     know, record regarding those six, half a dozen
14     conversations?
15 A.  I did not personally, no.
16 Q.  To your knowledge, to your recollection, did she?
17 A.  I can't speak for her.
18 Q.  Was she taking notes when you were talking to her?
19 A.  No, she was not.
20 Q.  I know you don't know what she did later. I get that.
21 A.  Yeah.
22 Q.  Did you diary any of it other than, you know, just what
23     you may have put in the training record?
24 A.  The concerns that I brought to her was what the master
25     trainers had brought to me, and they had also talked to

14 (Pages 50 - 53)

Carroll Reporting & Video
A Veritext Company

www.veritext.com

586-468-2411
www.veritext.com

Page 54

1   her. So this was nothing more than just my knowledge
2   going to her that I knew this was some issues that were
3   going on.
4   Q.  I'm focusing, as best I can, on written documentation,
5   because it's been minimal in this case, to say the
6   least. Was there any writing that you received from
7   your trainers or you received from Ms. Guerber that
8   isn't reflected in the training reports?  Are there any
9   freestanding text messages, or emails, or notes that
10  memorialize or creates some sorts of file regarding
11  concerns, anybody's concerns?  You know, the trainers,
12  or Ms. Guerber, or anybody at Beaumont, anybody in the
13  world about Mr. Maul?
14  A.  The only documentation that I'm aware of is the ones
15  that when the master trainers came to me with their
16  concerns, I would tell them to document it on the
17  training report. That's it.
18  Q.  Did you personally witness Mr. Maul working with his
19  dog, his K-9 at Beaumont?
20  A.  No.
21  Q.  Did you review any documents in preparation for your
22  dep today?
23  A.  Yes.
24  Q.  What did you review?
25  A.  I reviewed the depositions that have been completed so

Page 55

1   far.
2   Q.  Of Mr. Maul?
3   A.  Correct.
4   Q.  Any other documents?
5   A.  I did tell you I did go in on the training reports to
6   take a brief look.
7   Q.  Was that in preparing for the deposition?
8   A.  No, I had done that prior before.
9   Q.  But you didn't go back and revisit it?
10  A.  No.
11  Q.  Any other documents other than Mr. Maul's deposition?
12  A.  No.
13  Q.  Have you seen the complaint filed in this matter?
14  A.  Yes.
15  Q.  Did you review that in preparation for your dep?
16  A.  I did.
17  Q.  What about any discovery or written discovery from Mr.
18  Maul, Answers to Interrogatories or initial
19  disclosures, those types of things, court documents in
20  this case?
21  A.  Yes, I did answer all those.
22  Q.  Not answer.
23  A.  Oh.
24  Q.  I'm asking what you reviewed to prepare for today.
25  A.  Oh, okay.

Page 56

1   Q.  Mr. Maul with the assistance of Ms. Croson and me
2   provided documents and Answers to Interrogatories, and
3   initial disclosures, an official document that we have
4   do through the court system.  Did you review those?
5   A.  Yes.
6   Q.  Other than conversations with Mr. Fett, and/or
7   conversations where -- any conversation where Mr. Fett
8   is present, have you talked about this matter with
9   anybody else?
10  A.  No.  Can I back up on that?
11  Q.  Of course.
12  A.  I talked with my wife.
13  Q.  Well, I would hope so.
14  A.  Don't want to make it sound like I didn't keep her in
15  the loop.
16  Q.  No. I understand. I understand.
17  A.  Okay.
18  Q.  I mean, has there been occasions where you and Mr. Mack
19  and Mr. Wilkes, just the three of you, have talked
20  about this litigation and how you're going to handle
21  it, and how you're going to handle depositions?
22  A.  I didn't have to talk about how to handle depositions,
23  or anything like that. Have we talked about the case
24  ongoing, yes. But other than that, nothing else.
25          DEPOSITION EXHIBIT 1

Page 57

1          Defendant K-9 Academy Training Facility,
2          LLC's Responses to Plaintiff's First
3          Interrogatories
4          11:20 a.m.
5   BY MS. GORMAN:
6   Q.  Mr. Foley, I've handed you what's been marked as
7   Exhibit 1. Exhibit 1 presents as Defendant K-9 Academy
8   Training Facility, LLCs Responses to Plaintiff's First
9   Interrogatories. Would you take a moment to look
10  through it.
11  A.  Yes. I have seen this document.
12  Q.  Okay. Well, that answers my next question.  Have you
13  seen this document, yes, you have. All right.
14  A.  Yes.
15  Q.  Did you provide the answers that are bolded throughout
16  this document?
17  A.  Yes.
18  Q.  Okay.  So number one is correct when it says that
19  you're the one who answered these?
20  A.  Correct.
21  Q.  Did you review these before they were provided to
22  Ms. Croson and myself?
23  A.  Yes. I received them, and they were blank, and then
24  I -- after going over it, I went back and I made the
25  answers.

15 (Pages 54 - 57)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 58

1  Q.  Once they were typed up, and the document itself was
2      created, did you review it?
3  A.  Yes.
4  Q.  Okay. If you look at the back page, it has a line for
5      your signature, but no signature. Have you ever signed
6      these documents or this document?
7  A.  Yes. I signed it, and sent it back.
8          MS. GORMAN:  Can I get a copy of that, Jim?
9      I don't think I received it.
10         MR. FETT:  Okay. Yeah.
11  BY MS. GORMAN:
12  Q.  I want you to take a close look at your answers. My
13      next question, and keep my next question in mind is,
14      you know, as you sit here today, are these answers true
15      and accurate?  Is there anything you want to change in
16      them?
17  A.  No.
18  Q.  If you look at question number three -- let me back up.
19      Question number two, the question, Have you or your
20      attorney, or anyone acting on your behalf obtained any
21      statements in any form from any persons regarding any
22      of the events or happenings referred to in this matter.
23      And you say no. Is that answer true today?
24  A.  Correct.
25  Q.  You have no affidavits or statements, written

Page 59

1      statements from anyone?
2  A.  No.
3  Q.  Okay. Paragraph three we've already talked about, so I
4      don't have to go over that. Four, have you told me
5      everything about the application and hiring process
6      that you used when hiring Mr. Mack?
7  A.  Yes.
8  Q.  Did you subject him to, or was he subjected to any kind
9      of drug testing, or background checks, or anything like
10      that, or did you just base your decision on the years
11      that you've known him?
12  A.  Personal knowledge, correct.
13  Q.  Same with Mr. Wilkes?
14  A.  Correct.
15  Q.  Paragraph 8, this goes to some of the questions I asked
16      today. State whether there's protocols, procedures,
17      guidelines, etc., and you say a full service curriculum
18      to follow.
19  A.  Yes.
20  Q.  Have you provided that to Mr. Fett?
21  A.  Yes.
22  Q.  Okay. And you provided that to us? I would ask that
23      you make sure you provide one to Mr. Fett, because I
24      don't have it.
25  A.  Okay.

Page 60

1  Q.  I'd appreciate that. Thank you.
2  A.  No problem.
3  Q.  Number 10 I asked for witnesses, and what you
4      anticipate their testimony being. There is a witness
5      list, so I won't go over all of that with you. But you
6      say each will testify to training the plaintiff, and
7      documenting same. One final time, is there any other
8      kind of documentation to which you are referring when
9      you say documenting same other than the training
10      record?
11  A.  No.
12  Q.  Okay. With the training record, have you provided that
13      to Mr. Fett?
14  A.  Yes.
15  Q.  Would you please do so again so I can make sure I get a
16      copy?
17          MR. FETT:  I provided a copy of that.
18          MS. GORMAN:  We got a copy of the whole
19      training record?
20          MR. FETT:  All that we could find.  And your
21      client has some, too. But I gave you everything we
22      have.
23          MS. GORMAN:  Okay. That gets to a question I
24      have later.
25  BY MS. GORMAN:

Page 61

1  Q.  Paragraph number 11 asked about expert witnesses. It
2      wasn't answered here. To your knowledge, Mr. Foley, has
3      an expert witness been retained in this matter?
4  A.  No.
5  Q.  Do you anticipate hiring somebody like yourself for any
6      reason in this matter?
7  A.  No.
8  Q.  Okay.
9  A.  I don't know how I missed that. I'm sorry.
10  Q.  That's okay. It happens all the time. 12, 13, I asked
11      about Mr. Maul's certification that we talked at length
12      about today, and you tell me that it was not revoked.
13      Is it your understanding he still has an active
14      certification?
15  A.  He does not today.
16  Q.  Why is that?  If it wasn't revoked, how does he not
17      have it?
18  A.  Are you talking about K-9 Academy now?
19  Q.  Plaintiff's K-9 certification, the one -- or, no, the
20      certification that NAPCH issued to him.
21  A.  That was a separate question.
22  Q.  Let's answer it for both organizations then.
23  A.  K-9 certification says right on the certification that
24      as long as a member in good standing with their
25      department.

16 (Pages 58 - 61)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 62

1  Q.  Okay.
2  A.  I did not revoke it. NAPCH revoked his certification
3      because he was no longer a paid K-9 handler. Does that
4      answer your question?
5  Q.  It does. It does.
6  A.  Okay.
7  Q.  So if Mr. Maul were to apply and be accepted and be
8      hired at McLaren, for example, one of your -- one of
9      the hospital systems that you work with, right?
10  A.  Yes.
11  Q.  If he got a job with McLaren as a K-9 handler, would he
12      be entitled to reinstate his revocation or his
13      certification, both certifications?
14  A.  He would not be able to.  K-9 was not revoked. K-9
15      Academy was -- it's no longer valid because he no
16      longer trains at the facility.
17  Q.  Okay.
18  A.  So that NAPCH, if he becomes a paid K-9 handler at some
19      other location, then he can become a NAPCH member
20      again.
21  Q.  Okay.
22  A.  His certification won't go away.
23  Q.  Okay.  All right. That's good to know.
24  A.  It's only valid for so long anyways. That's in our
25      bylaws.

Page 63

1  Q.  I understand. Would K-9, the K-9 certification that you
2      say is no longer valid, I don't want to play a game
3      with semantics, but he has an invalid certification now
4      as opposed to a revoked certification?
5  A.  He no longer holds his certification from K-9 Academy.
6  Q.  How is this different than having it revoked?
7  A.  Well, because it wasn't that we took it away from him.
8      It was part of the agreement on the certification
9      itself. So he no longer meets that, so he doesn't have
10      that certification in his possession, but the
11      certification he did complete it.
12  Q.  Right.
13  A.  So it was there.
14  Q.  So if he -- if he gets a job someplace as a K-9
15      handler, will that validate his certification, K-9
16      certification?
17  A.  No.
18  Q.  Why?
19  A.  Because he does not train at the facility any longer.
20  Q.  What if he did?
21  A.  If he did, then yes.
22  Q.  Is he allowed to train at the facility?
23  A.  If he is employed by somebody who wants to train at my
24      facility, yes.
25  Q.  Okay.

Page 64

1  A.  In other words, Tyler can't come in and say, hey, I
2      want to train here.
3  Q.  I understand that.
4  A.  It has to be sponsored, whether it's through a private
5      company, or through another department.
6  Q.  Okay. So he's not banned from future training
7      opportunities at K-9?
8  A.  He is not banned.
9  Q.  14, state specific reasons why plaintiff was terminated
10      from participating in the training provided by
11      defendants. And you say Beaumont Health made the
12      decision. Is there any documentation separate from the
13      training file that you have regarding Beaumont
14      allegedly making the decision that he cease
15      participating in the training program offered by K-9?
16  A.  No.
17  Q.  Do you recall ever receiving an email, a text message,
18      a letter from Wendy Guerber or anybody at Beaumont
19      saying, just to let you know, Tyler Maul won't be
20      training with the organization any more?
21  A.  Whitney Guerber personally just called me on the
22      telephone and told me that.
23  Q.  When did she do that?
24  A.  I don't know the exact date.
25  Q.  Was there any other conversations you had with Wendy

Page 65

1      Guerber where you discussed complaints that Tyler Maul
2      had made regarding what he believed to be cruel
3      treatment of Lincoln by Danny Mack?
4  A.  No.
5  Q.  Was that ever discussed with you?
6  A.  That was never discussed with me.
7  Q.  Had you ever heard about those allegations
8      prior to seeing it in our complaint?
9  A.  Yes.
10  Q.  Okay.  Tell me how you learned of those allegations?
11  A.  I received a telephone call from a vet.
12  Q.  At Cahill?
13  A.  Cahill did call, but actually the first one that called
14      was Woodhaven Animal Clinic.
15  Q.  Okay.
16  A.  Dr. Greear.
17  Q.  Dr. Greear?
18  A.  Yep.
19  Q.  And what did Dr. Greear call you about?
20  A.  Asked if I knew this person, Tyler Maul, was into their
21      vet office claiming that his dog was electrocuted.
22  Q.  Okay. Did they examine the dog?
23  A.  I don't know. You have to ask them.
24  Q.  I will.
25  A.  Yeah, I don't know.

17 (Pages 62 - 65)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 66

```
 1  Q.  This is the first I've heard of them. Tell me what you
 2      recall of that conversation with Dr. Greear, please.
 3  A.  Well, Dr. Greear is known from the past.
 4  Q.  You know him personally?
 5  A.  Her.
 6  Q.  Her, okay. Shame on me for making that assumption.
 7  A.  No, no. And she said, I can't believe none of this went
 8      on, you know, because she knows us. And I said okay.
 9      None of this stuff happened. I don't know. And she
10      goes, well, I just want to let you know that he was
11      here, and I said fine.
12  Q.  Okay. Did she give you any indication of having seen
13      the dog or checked the dog out?
14  A.  Well, I know that he and the dog came there, so I don't
15      know if they actually evaluated the dog, went over the
16      dog.
17  Q.  You didn't talk about it?
18  A.  She didn't talk nothing about that, and I didn't ask.
19  Q.  Well, sure. Okay. Anybody else? Any other way that
20      issue was raised?
21  A.  I was then notified by the Woodhaven Police Department,
22      a commander, who called me and said that the mayor came
23      to him about allegations of electrocuting the dog, and
24      about the dog.
25  Q.  All right.
```

Page 67

```
 1  A.  And I said to him, you know, Tyler was a handler here,
 2      and I'm aware of these accusations, but they did not
 3      happen. And I left it at that. I didn't discuss
 4      anything further with him.
 5  Q.  Which came first, the animal clinic or the police
 6      department?
 7  A.  The clinic. Dr. Greear came first, and then the
 8      commander called me and said the mayor had been in
 9      touch with him.
10  Q.  And is it true that both of these calls came in while
11      Tyler was still actively working as a handler trainer?
12  A.  No, he was not active at that point, from what I was
13      understanding. He was off ill, or something of that
14      nature, at the time.
15  Q.  He may have been ill, but his relationship with K-9 and
16      Beaumont frankly at that time had not been severed,
17      correct?
18  A.  Correct.
19  Q.  So this is pre cutting him loose before he leaves
20      Beaumont before he is no longer coming to your entity?
21  A.  Yes, that's correct, yes.
22  Q.  Do you know approximately how much longer K-9's
23      relationship with Tyler lasted after this?
24  A.  I don't have an exact timeframe. I know it was a few
25      more weeks.
```

Page 68

```
 1  Q.  How close in time was the call from the animal clinic
 2      and the police department?
 3  A.  Within a day.
 4  Q.  Okay. Other than denying, flat out denying that that
 5      happened at your at K-9 facility, did you talk to Mr.
 6      Mack about the accusations?
 7  A.  No.
 8  Q.  Did you investigate? Did you look at the dog yourself?
 9  A.  I did not see the dog myself, no.
10  Q.  Did you talk to anybody at K-9, you know, hey, I got
11      this phone call. I mean, did you just flat out deny it
12      and drop it, or did you take any other action?
13  A.  After receiving those calls, I then talked to Whitney
14      Guerber and said, hey, letting you know I received
15      these phone calls. And then, yes, it was communicated
16      to Mr. Wilkes and Mr. Mack at that point.
17  Q.  Okay. When you talked to Ms. Guerber, did she indicate
18      that she already knew about the accusations?
19  A.  She did.
20  Q.  Can you approximate the length of time between your
21      conversations with the folks in Woodhaven and your
22      conversation with Whitney, your conversations with Mr.
23      Mack and Mr. Wilkes, how much time elapsed between
24      those and Mr. Maul severing his relationship with K-9,
25      or the relationship being severed?
```

Page 69

```
 1  A.  Again, I think that was probably three, four weeks
 2      after that they severed it.
 3  Q.  Okay. Were you aware of a meeting on August 16th,
 4      2023, '22? Where are we, '22, with Mr. Mack, Mr.
 5      Wilkes, Ms. Guerber and Mr. Maul?
 6  A.  Yes.
 7  Q.  Did you attend that?
 8  A.  I did not.
 9  Q.  Did you request that it be convened?
10  A.  I believe that was actually brought on by Whitney.
11  Q.  Have you heard the recording from that meeting?
12  A.  I have.
13  Q.  Did listening to that recording result in any concerns
14      on your part regarding the way Mr. Mack and/or Mr.
15      Wilkes dealt with Mr. Maul in the meeting?
16  A.  No, I thought it was quite professional.
17  Q.  Okay. Looking at 17 on the next to last page, we asked
18      state the substance of all discussions that any
19      defendant K-9 Academy Training Facility, LLC owner,
20      employee, independent contractor, had with any employee
21      of Beaumont Hospital Dearborn regarding the claims
22      alleged by plaintiff in his complaint. State when and
23      where each discussion took place, and identify all
24      persons who were present. And your answer is not
25      applicable. Would you like to modify that?
```

18 (Pages 66 - 69)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 70

1  A.  I think I answered that because this was in reference
2      to the plaintiff of his complaint.
3  Q.  Yeah, regarding the claims alleged by plaintiff in this
4      matter?
5  A.  I'm not aware of any discussions after from the
6      plaintiff on his complaint after that meeting they had
7      with him in the office.
8  Q.  The August 16th meeting?
9  A.  Yeah.
10  Q.  Okay.  Do you have knowledge other than, well, do you
11     have knowledge of any conversations that Mr. Wilkes had
12     with anybody at Beaumont regarding Tyler Maul?
13  A.  Am I aware of any?
14  Q.  Yeah.  Did he report any to you?
15  A.  Yes.
16  Q.  Were you present for any that Mr. Wilkes himself was
17     having?
18  A.  Not all of them, no.
19  Q.  Well, any of them?
20  A.  Yes. There was times that Whitney was at the facility,
21     and we had talked all together, so yes.
22  Q.  Whitney Guerber, Mr. Wilkes and yourself?
23  A.  Yes.
24  Q.  Mr. Mack there, too?
25  A.  He may have been on a couple of the occasions. I just

Page 71

1      remember mainly with Mr. Wilkes.
2  Q.  Okay.  And was this an ongoing discussion, or were
3      these specific instances?  What was discussed?
4  A.  So this was during the initial training, the concerns
5      that were being brought up about performance and things
6      that were going on. So I was involved in a couple of
7      those, yes.
8  Q.  The initial training, what, the first 16 weeks?
9  A.  Correct.
10  Q.  Okay.  Were those concerns documented?
11  A.  So, yes, the concerns were put in the training
12     documentation.
13  Q.  Okay.
14  A.  Yes.
15  Q.  Is it accurate to say whatever concerns there were at
16     the time didn't get in the way of him becoming
17     certified, correct?
18  A.  Correct.
19  Q.  Well, during those 16 weeks, if there's grave concerns,
20     wouldn't K-9 and NAPCH have the right to -- or not
21     NAPCH from what you said, but K-9 have the right to
22     say, no, you can't be certified.  You're not deserving
23     of certification because of this problem, this problem,
24     this problem?
25  A.  Certification is a testing process.

Page 72

1  Q.  Yeah.
2  A.  Whether they pass or fail.
3  Q.  Okay.
4  A.  All right. The training process is like a report card,
5      you know, this is going on. This is going on. You need
6      to improve here, those kind of things. And that's what
7      we keep the employer up on. If we have concerns, we
8      bring it to the employer.
9  Q.  Did you bring it to Tyler, to Mr. Maul?
10  A.  Yes.
11  Q.  And did he aspire to learn from the criticism, or to
12     get better and better?
13  A.  Well, that's our goal.
14  Q.  No. I understand your goal.
15  A.  Yes.
16  Q.  What did you witness with Mr. Maul?  Did he seem to
17     listen to want to be taught?
18  A.  So I was never in a discussion with Mr. Maul about his
19     performance. I was only in the discussions with
20     Whitney and Mr. Wilkes.
21  Q.  Fair enough. Did anybody ever, Mr. Wilkes or Mr. Mack
22     ever say to you, you know, not only is he not, you
23     know, performing the way we'd like him to perform, but
24     he just doesn't seem to care either. He just doesn't
25     want to take our criticism. Is there any other reason

Page 73

1      to think that Tyler just was just blowing off the
2      criticisms or the teaching?
3  A.  I know he was struggling with the criticism, but he was
4      not blowing it off.
5          DEPOSITION EXHIBIT 2
6          Subpoena
7          11:45 a.m.
8  BY MS. GORMAN:
9  Q.  I'm handing you what's been marked as Exhibit 2, Mr.
10     Foley. Exhibit 2 presents as a subpoena signed by me
11     requesting or commanding, as it were, your appearance
12     here today. Did you receive a copy of this?
13  A.  I did.
14  Q.  Did you review it?
15  A.  Yes.
16  Q.  Okay.  It had addendum A, which I will represent to you
17     was the same request that was attached to a subpoena
18     that my partner, Charlotte Croson, had submitted for
19     production. We've gone over -- I think I've asked it
20     every way I can about documents. Did you review all the
21     things that we requested, the 21 items on the addendum?
22  A.  Yes, I did.
23  Q.  Is it your sworn testimony that you have provided your
24     counsel with every possible document responsive to
25     these requests?

19 (Pages 70 - 73)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 74

1  A.  Yes.
2  Q.  There's nothing that you're withholding, no stone
3       unturned that you haven't looked at?  Do we have it
4       all, or does at least Mr. Fett have it all?
5  A.  Yes.
6  Q.  Okay.  To your knowledge, are there any other
7       recordings other than the one we've talked about, the
8       August 16th meeting?
9  A.  Not that I'm aware of.
10 Q.  You listened to that recording, correct?
11 A.  I did.
12 Q.  It starts in the middle of a sentence.  It starts in the
13      middle.  It does not start with, Tyler, please come into
14      the meeting.  We'd like to talk to you.  It starts in
15      the middle of something.  If you looked at a transcript
16      it becomes very clear.  To your knowledge, is there any
17      recording of the meeting that happened before, or the
18      conversations that were going on before calling Tyler
19      into the meeting?
20 A.  No.
21 Q.  Okay.  Are you aware that -- do you know who Joe Tucker
22      is?
23 A.  I am aware.
24 Q.  Are you aware that Mr. Tucker was present before they
25      called Tyler into the meeting?

Page 75

1  A.  I am aware of that.
2  Q.  Is there a recording, to your knowledge, of the
3       conversation that took place with Mr. Tucker prior to
4       Mr. Maul being invited into the meeting?
5  A.  No.
6  Q.  And there's no other recordings, you know, to your
7       knowledge?
8  A.  No.
9  Q.  Are there any recordings made at the site when anybody
10      was counseling Tyler talking with Whitney Guerber,
11      talking amongst yourselves?
12 A.  Not that I'm aware of.
13 Q.  Okay.  Are you aware of any documents that have not
14      been produced by Mr. Mack?
15 A.  No.
16 Q.  Same question as to Mr. Wilkes, anything?
17 A.  No.
18 Q.  Has K-9 ever been sued?  Other than this litigation,
19      has K-9 ever been sued by a former handler?
20 A.  No.
21 Q.  What about NAPCH, has any former member or current
22      member ever sued NAPCH for any reason?
23 A.  No.
24 Q.  Okay.  I was handed your resume.  I appreciate this.
25      This is accurate as to today, all the way up to today?

Page 76

1  A.  Yes.
2  Q.  Perfect.  It's pretty impressive.
3  A.  Thank you.
4       MS. GORMAN:  I have no further questions
5  right now.  I'll yield to Mr. Fett.
6       MR. FETT:  Did you mark this CV as an
7  exhibit?
8       MS. GORMAN:  I did not.
9       MR. FETT:  I would like to mark that.  Off
10 the record.
11      (Off the record at 11:50 a.m.)
12      (Back on the record at 11:55 a.m.)
13      DEPOSITION EXHIBIT 3
14      Resume
15      11:55 a.m.
16      EXAMINATION
17 BY MR. FETT:
18 Q.  All right.  Ready to go back on the record?  Mr. Foley,
19      you were asked about whether you provided all documents
20      in response to Exhibit Number 2, and I think Ms. Gorman
21      told you that the attachment was the same as that we
22      earlier responded to?
23 A.  Correct.
24 Q.  Okay.  Or at least was sent to Beaumont.  Was the
25      entirety of your response the certification, the NAPCH

Page 77

1       certification?
2  A.  Correct.
3  Q.  Are you aware of whether Mr. Maul ever came back to do
4       any training after the August 16th, 2022 meeting that
5       he had with Ms. Guerber, Dan Mack and Mark Wilkes?
6  A.  No, I don't believe so.
7  Q.  And neither you, Mr. Wilkes, or Mr. Mack, or K-9 were
8       ever Mr. Maul's employer; is that true?
9  A.  Correct.
10 Q.  You listened to the tape of the August 16th, 2022
11      meeting, right?
12 A.  Correct.
13 Q.  At any point, would you characterize the behavior of
14      Mr. Mack has harassing and berating Mr. Maul?
15 A.  No.
16 Q.  Same question as to Mr. Wilkes.
17 A.  No.
18 Q.  Same question as to Ms. Guerber.
19 A.  No.
20 Q.  Did they seem to be companionate and understanding in
21      that meeting with Mr. Maul?
22 A.  Yes.
23      DEPOSITION EXHIBIT 4
24      Excerpt from Tyler Maul's Deposition, Pages
25      14-17

20 (Pages 74 - 77)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 78

1    11:59 a.m.
2    DEPOSITION EXHIBIT 5
3    Excerpt from Tyler Maul's Deposition, Pages
4    54-57
5    12:00 p.m.
6  BY MR. FETT:
7  Q.  I'm going to give you what I've marked as Exhibit 4.
8      And I will tell you that this is an excerpt from Mr.
9      Maul's deposition.  And I'm going to give you Exhibit
10     5, which is another excerpt.  Starting with Exhibit 4,
11     at my request did you review these excerpts from Mr.
12     Maul's deposition, that being 14 through 17?
13 A.  Yes.
14 Q.  And Mr. Maul indicates that his symptoms are, "Pretty
15     much like what the unknown is. I know that like
16     whenever -- I know like when you get into anxiety, you
17     have that fight or flight. I know I'm more of a flight.
18     I get scared almost. Sometimes when it gets real bad,
19     it's just like it feels like a frog is in my throat. I
20     worry. I know that sometimes my muscles lock up. I know
21     that symptoms with this new diagnosis, it's hard for me
22     to remember things." Did you read the rest of these
23     pages, 14 through 17?
24 A.  I did.
25 Q.  With the symptoms that Mr. Maul describes in this

Page 79

1      passage of his deposition, was he qualified to be a
2      security guard?
3  A.  I would say no.
4  Q.  And why do you say that?
5  A.  Well, with the stressful situations that you meet
6      within the hospital, this would be a real personal
7      problem, and he wouldn't be able to act in a stressful
8      situation.
9  Q.  Do security at hospitals or other facilities encounter
10     the bad actors before law enforcement arrives?
11 A.  Yes, they do.
12 Q.  Have you ever heard of the term the tip of the spear?
13 A.  Yes.
14 Q.  And are security officers the tip of the spear when it
15     comes to dealing with wrongdoers before the law
16     enforcement arrives?
17 A.  Yes.
18 Q.  Do you see in these comments that Mr. Maul has had
19     these symptoms for over 20 years?
20 A.  I'm seeing it on the document, yes.
21 Q.  But, I mean, you recall reading that?
22 A.  Yes.
23 Q.  In fact, he indicates at the bottom of 17 that he's had
24     these symptoms for many years?
25 A.  Correct.

Page 80

1  Q.  He also indicates, again, on page 17, I'm sorry, page
2      17 line 15, he's asked, "Ever have problems with your
3      body just seizes up?"  And his answer is yes.
4  A.  Yes, I see that.
5  Q.  Can you see where that would be a problem if you are
6      the tip of the spear, and having to respond before the
7      first responders arrive?
8  A.  Yes.
9  Q.  Now, I asked that question regarding a security guard.
10     I'm going to ask you about a K-9 security guard.  Is
11     your opinion the same with regard to a K-9 security
12     guard?
13 A.  Yes, it is.
14 Q.  Is it even more of problem if someone is a dog handler?
15 A.  Yes.
16 Q.  And why is that?
17 A.  Because you have a live animal that you are in control
18     of, and you have to be able to react to what that
19     animal does or does not do.
20 Q.  I'm looking at Exhibit 5, which is pages 54 through 57.
21     And Mr. Maul is asked on page 54 about being out of
22     breath, and he was asked, "Was that because you were
23     tired, not in shape, or because of anxiety?  What was
24     it?"  And his answer was, "So I know that when I get in
25     a panic, sometimes like I start like hyperventilating,

Page 81

1      and I know that like I start worrying like, oh, my God.
2      Am I doing this right. I know when it gets really bad,
3      or when it gets far stretched out, I feel disassociated
4      from my body. It's like I don't even know how to say.
5      When I was saying the whole fight or flight situation,
6      I'm more of a flight. I don't really react with anger
7      compared to what my flight. When my flight happens,
8      it's like I turn ghost white almost like how they claim
9      that I look lifeless. That was part of my anxiety." Do
10     you see where those symptoms would be a problem if you
11     were a security guard?
12 A.  Yes.
13 Q.  And if you were a K-9 security guard?
14 A.  Yes.
15 Q.  You didn't know anything about these symptoms before
16     Mr. Maul started training with you, did you?
17 A.  I did not.
18 Q.  As far as you know, nobody else at K-9 knew about these
19     symptoms at any time before this lawsuit, true?
20 A.  True.
21 Q.  Did you ever talk with Mr. Cotton about Tyler Maul?
22 A.  I did not.
23 Q.  Did you ever talk with Joe Tucker about Tyler Maul?
24 A.  Yes, I did.
25 Q.  What was the conversation?

21 (Pages 78 - 81)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 82

1  A.  That was generated by Mr. Tucker who called me. He was
2     made aware from Whitney about the concerns that we had.
3  Q.  And what did you tell him?
4  A.  I just verified that the master trainers were making it
5     known of some performance issues. So it was just a
6     verification, if you will.
7  Q.  At any point, did you recommend to Mr. Tucker that
8     Beaumont fire Tyler Maul?
9  A.  Not at any time.
10 Q.  Did you have any input into his termination?
11 A.  None.
12 Q.  Was there a Lt. White that worked for Beaumont, Deshawn
13    White?
14 A.  I have not talked to him.
15 Q.  Okay. Certainly not Mr. Maul; is that right?
16 A.  Correct.
17 Q.  Did you recommend to anybody at Beaumont that they
18    should terminate Mr. Maul's employment?
19 A.  No.
20 Q.  Other than the discussion where you verified for Mr.
21    Tucker your concerns of your trainers, did you talk
22    with anybody else at Beaumont about Mr. Maul?
23 A.  No.
24 Q.  Are you aware of any contractor or subcontractor
25    trainer, whatever, recommending to Beaumont that they

Page 84

1     at Beaumont?
2  A.  Not that I'm aware of, no.
3  Q.  How about a K-9 security officer at Beaumont, could a
4     blind person do that job?
5  A.  No.
6  Q.  And could a person with such severe emotional problems
7     as Tyler Maul perform in a manner safe for him, and the
8     public, and his employer as a security guard for
9     Oakwood?
10 A.  I don't believe so.
11       MR. FETT:  That's all I have.
12       MS. GORMAN:  That's all I have. Thank you.
13       (The Deposition was concluded at 12:10 p.m.
14    Signature of the witness was not requested by
15    counsel for the respective parties hereto.)

Page 83

1     fire Mr. Maul?
2  A.  No.
3  Q.  Is that their place to do so?
4  A.  They're the employer. That's their job, not mine.
5        MR. FETT: Hold on for just a second. I need
6     to retrieve one more document.
7        (Off the record at 12:08 p.m.)
8        (Back on the record at 12:09 p.m.)
9        MR. FETT: I don't have anything further.
10       RE-EXAMINATION
11 BY MS. GORMAN:
12 Q.  Two or three follow-ups. Mr. Foley, have you ever seen
13    any of the performance evaluations that Beaumont
14    conducted on Mr. Maul as a security guard?
15 A.  No.
16 Q.  Have you ever seen any -- have you ever seen him
17    performing his job as a security guard at Beaumont?
18 A.  No.
19 Q.  Have you ever seen him performing his job as a K-9
20    security guard at Beaumont?
21 A.  No.
22       MS. GORMAN: I have no further questions.
23       RE-EXAMINATION
24 BY MR. FETT:
25 Q.  Mr. Foley, could a blind person be a security officer

Page 85

1        CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN  )
3                     ) SS
4  COUNTY OF WAYNE    )
5
6        I, JOANNE MARIE BUGG, certify that this
7  deposition was taken before me on the date hereinbefore
8  set forth; that the foregoing questions and answers
9  were reported by me stenographically and reduced to
10 computer transcription; that this is a true, full and
11 correct transcript of my stenographic notes so taken;
12 and that I am not related to, nor of counsel to, either
13 party nor interested in the event of this cause.
14
15
16
17
18
19       *Joanne M. Bugg*
20
21       JOANNE MARIE BUGG, CSR-2592
22       Notary Public
23       Wayne County, Michigan
24       My Commission expires: 2-26-2025
25

22 (Pages 82 - 85)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com